Appeal No. 06-1088 Distar Textilfarben v. CH Patrick Co Now, despite the deference owed to the jury in terms of substantial evidence, isn't a trial judge on the issue of obviousness in the face of a jury verdict obliged to ultimately do a legal analysis of whether the facts as apparently found by the jury resolve the question of obviousness in a way that's legally correct? And if that is the obligation of this judge, how can we tell whether he carried it out or not? Because he didn't say a word except not obvious. Well, there's two parts to the answer. The first is, while there were two questions. Sorry. The federal rules of civil procedure permit him to just let the judge answer. He doesn't have to say anything. So the first. It may be that there isn't a rule violation. On the other hand, I believe there's considerable case law that says that when an appellate court is confronted with a black box opinion that's utterly opaque, you can't tell what the judge thought, much less why, that we can vacate and remand. Why shouldn't we do so here? Well, the judge did say, and he did listen to all of the evidence and evaluated the credibility of the witnesses. But he didn't explain anything. All the things we're discussing here with Mr. Jones and with you and with one another and delving into all these references that we're naming, he never said a word about any of that. How can we tell what he made of any of that? Because he did say that the verdict was reasonable and was based upon substantial evidence in view of the credibility determinations. That's what he said. Yeah, but that's not reviewable. How do we know whether it's reasonable? Well, one aspect of that is that Judge Cato is very familiar with patent law. He's the judge who handled a lot of general proceedings. It doesn't make any difference. Whether a magistrate judge or a district judge has tried two patent cases or 2,000, we still have to have an opinion that supports meaningful review. And I'm questioning whether we have that here. And if we don't, why aren't we obligated to vacate and remand whatever our view of the ultimate issue of obviousness might be? Your Honor, if we have a jury verdict, there's no need for an opinion. I mean, that's the whole point of a jury trial. You turn it over to the jury. Well, that might be true if there was no such a thing as a post-verdict JMAL motion. But there is. There's no precedent, so far as I know, that says if somebody makes a JMAL verdict and the judge denies it, he has to write an opinion. And in fact, in Old Town Canoe, the judge's verdict of jail MOL on no inequitable conduct was affirmed and he made no findings. It was affirmed by this court. He made no findings. He said it was not shown to be an abuse of discretion. The art simply does not teach one of ordinary skill in the art of dying to take this solution of brochet and use it. Even Brochet himself says you can't use it as a guide. Where does he say that? He says that in his article. His article says, I talked about all these vacations from elsewhere. Because it's unstable. Sorry? Because it's unstable. That's correct. It's unstable. It's unstable. And remember. But that leads to the chief judge's question. Why then just seal it? Maybe it doesn't work. There was no evidence on that at trial. Maybe it doesn't work. We don't know. They didn't put evidence on that point into the record. Now, there is other evidence that this is not pertinent art. The jury had textbooks from 1910, from 1922, from 1933, and from 1953 that were directed to dying, to people who died. Not one of those textbooks referenced one of these references. A dyer would not consider these references. Just wouldn't. A dyer is interested in how to die. And this patent is the first patent, it's the first time anyone introduced this into a dye battle. Mr. Jones was talking about a secret sale in Brazil of secret making and sale in Brazil. That dying attempt failed. It failed. They said it's because of mistakes. But if it failed, how can it possibly have been accomplished? They said it was because of mistakes by the users. Exactly. Not mistakes in the creation of the product to be employed in the method. Mistakes by the dyer. The person to whom the patent is directed. If the dyer couldn't get it to work, how does that make the existence of the solution make it obvious to die? Maybe we have a semantical problem here. You're referring to the dyer as if it's the guy who stirs the vat. I would think in the case of a method for doing dying that the artisan is a dye method designer, not a guy who stirs a vat with a patent. No, Your Honor, that wasn't the testimony. At trial, the testimony was the dyer, the person with skill in the art, is the guy with the patent, is the guy that flips the switches. But there's got to be somebody above him who designed the whole process, who built the vats, who decided that maybe that's the problem. Maybe the skill in the art was set far too low here. So it's conflicting expert testimony on what the skill in the art was. And the jury elected to believe the testimony of dye starting expert. In the Fourth Circuit, when it's evident from a jury's verdict that the jury believed one expert over another, it's not the province of the appellate court to disturb that. I don't believe the standard was too low. We had a person testify about this. But the guy who's stirring the vat doesn't have any knowledge of the chemistry of leucoindigo. Correct. What we all understand is the key to this patent is the instability of leucoindigo and how do you surmount that. That's chemistry. That's not stirring vats. Correct. But that's not the only key to this patent. The other key to the patent is having the a-ha moment of saying, well, let's try to just introduce this into the dye vat. And lo and behold, it worked. No one thought it would work. But that wasn't the guy who stirred with the paddle. That was some bright chemist somewhere. Well, that was the inventor, George Schnitzer. Yeah, he doesn't have a paddle and stir dye, does he? Actually, he does. And his skin under his fingernails is blue. Thank you. We've given you a considerable extra time, Mr. Hino, so we'll have to call it to a halt. Mr. Jones, you have three minutes left of rebuttal time. Thank you, Your Honor. Just to address a couple quick things, and one thing to your point, Judge Rader, let me read to you out of the Chemont patent, 978. It says, and this is talking about a leucoindigo solution, and at the end of the day, whether you produce leucoindigo solutions by means of electrolysis or iron reduction or by catalytic hydrogenation, the chemical is the same. They are all unstable in the air. And this is what the 978 patent says. It is possible to preserve the indigo solution indefinitely in a closed vessel and consequently to place this solution on the market for use in dyeing. That was our evidence regarding this instability issue. Second issue, and Judge Rader, I don't know how you hit on this, but you must have read the transcript already because this was not in the appendix and in our briefs, but you're right. Some errors started creeping into this, and there was a gigantic error made by their technical expert, Dr. Blackman. I asked him twice, and this is the pages in the trial transcript, pages 399, 402, 403, and page 405. I asked him, isn't the real question in this case not what the authors meant by the term solution but how one of ordinary skill in the art in 1992 would have interpreted the word solution? Isn't that the real key answer? I don't think so, no. I asked him later on, and he said to the same question, I'm not entirely sure, I think I know what you're saying. It's difficult to make that judgment when I understand exactly what a solution is. And that was the error that crept in from their expert into the obviousness of the term solution and what the term solution means. As far as putting it together, the 1936 manual, Your Honor, you mentioned the BIOS report. I think it's actually the 1936 manual for dyeing cotton which puts everything together, and I'll just read to you from appendix page 829, 35. When dyeing with, and there's a laundry list including indigo solution, BASF 20%, containing the dye stuff in a reduced, and obviously that means a leuco condition, and water soluble state, the preparation of a stop vat is unnecessary. The 1936 manual is the piece of prior art that puts everything together. It says use this solution. And then, Your Honor, two other quick points. The sale by Mr. Band, again, it's not prior art under U.S. Patent Law. That's not what we're saying, but he sold it to a dyer for use in dyeing cotton, and that's exactly what this patent is about. And finally, Your Honor, please keep in mind the ordinary skill in the art, whether it's the higher level which we propose or whether it's the level that they propose. Somebody reading solution leads to solution. Thank you. All right, we thank both counsel. We'll take the appeal under advisement. All rise. The honor report is adjourned until tomorrow morning at 10 a.m. Thank you. Thank you.